**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ENDEAVOR GROUP HOLDINGS, INC.,

Plaintiff,

v.

TROLUCE NEXUS FUND LP; TROLUCE SPECIAL OPPORTUNITIES II, LP; JARED DUBIN; ICAHN ENTERPRISES L.P.; ICAHN PARTNERS LP; ICAHN PARTNERS MASTER FUND LP; CARL ICAHN; and DOES 1-X, the latter being fictitious names used to designate persons unknown,

Defendants.

No.: 26-cv-09417

**COMPLAINT**

Plaintiff Endeavor Group Holdings, Inc. ("Endeavor" or the "Company"), by and through its undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys. Plaintiff's investigation has included, among other things, a review of: (a) regulatory filings made by Defendants with the United States Securities and Exchange Commission ("SEC"); (b) news articles and analysts' reports about the Company, its shareholders, and the transactions at issue; (c) publicly available filings in *In re Endeavor S'holders Litig.*, No. 2025-0663-LWW (Del. Ch.) (the "Fiduciary Action"), *In re Appraisal of Endeavor*, No. 2025-0317-LWW (Del. Ch.) (the "Appraisal Action"), and *Endeavor Grp. Holdings, Inc. v. Troluce Capital Advisors, LLC*, C.A. No. 2026-1238-LWW (Del. Ch.) (the "Declaratory Judgment Action"); and (d) other publicly available information concerning Defendants.

## I. INTRODUCTION

1. This case concerns a coordinated scheme by some of the world's most sophisticated activist hedge funds to amass an enormous block of Endeavor stock during a pending take-private merger and use it to extract value beyond the merger price through exercising control over deal-related appraisal and fiduciary litigation. In so doing, Defendants, who collectively command billions of dollars in assets under management, filed fraudulent certifications with the SEC, stand to reap short-swing profits in violation of the Securities Exchange Act of 1934 (the "Exchange Act"), and evaded disclosure requirements of federal securities law that would have alerted the market and Plaintiff to their accumulations and intentions. Defendants have engaged in classic risk arbitrage—*i.e.*, trading on the outcome of a specific change-of-control transaction—through their litigation arbitrage scheme. The federal securities laws prohibited these risk arbitrageurs from making further purchases of Endeavor securities until enhanced disclosures were made. No such disclosure was made, yet Defendants proceeded to acquire sizable further blocks of Endeavor securities in direct violation of federal regulations.

2. Section 13(d) of the Exchange Act, enacted under the Williams Act of 1968 (the "Williams Act"), protects against precisely this kind of conduct. 15 U.S.C. § 78m(d). It requires any person or group that accumulates more than 5% of a public company's stock to disclose that fact publicly so that other investors, companies, and regulators can evaluate the implications of a large stake and the intentions behind it. *Id*. Defendants disregarded these requirements, instead accumulating millions of Endeavor shares worth hundreds of millions of dollars without making the required disclosures, at the expense of Plaintiff and the integrity of the public markets.

3. In March 2025, Silver Lake and its affiliates completed what was at the time the largest private equity take-private in over a decade: the $13 billion acquisition of Endeavor at

$27.50 per share (the "Merger"), a 57% premium to the Company's unaffected trading price. Before the Merger closed, a large group of investment funds, including Defendants and Doe Defendants as described below (the "Arbitrage Group"), descended on Endeavor's stock, rapidly amassing shares in a coordinated risk arbitrage strategy designed to seek additional value through appraisal and fiduciary litigation. By the Merger's closing, on information and belief, the Arbitrage Group collectively held at least 20% of Endeavor's stock, which it has used to pursue Delaware appraisal and fiduciary litigation claiming that Endeavor's "fair value" was more than the deal price.

4. The Williams Act was enacted to prevent undisclosed accumulation. Under the Act, any person or group acquiring beneficial ownership of more than 5% of a company's stock must disclose that fact publicly within five business days of crossing the threshold. 17 C.F.R. § 240.13d-1(a). The basis for this requirement is that the market has a right to know when large investors are amassing significant stakes, and companies have a right to know who their major shareholders are and what they intend to do. Defendants treated this requirement—and other related regulations—as optional.

5. Defendants Troluce Nexus Fund LP and Troluce Special Opportunities II, LP (together, the "Troluce Defendants") are investment vehicles managed by hedge fund Troluce Capital Advisors, LLC ("Troluce Capital"), which together accumulated over 35 million Endeavor shares worth nearly $1 billion at the deal price. Yet the Troluce Defendants filed only short-form Schedules 13G certifying that their shares were acquired in the ordinary course of business and not "in connection with" a change of control transaction. Those certifications were false: Troluce Capital is a professional merger arbitrageur whose position, which it held via the Troluce Defendants, was largely accumulated *after* the deal was announced, at prices *above* the Merger

consideration, for the purpose of pursuing appraisal litigation. The Troluce Defendants' purchases were not eligible for disclosure on short-form Schedule 13G filings, and yet they never filed any Schedules 13D in connection with their accumulations.

6. Defendant Carl Icahn ("Mr. Icahn") is a billionaire activist investor with a long track record of opposing take-private transactions and a history of regulatory violations. The Icahn Defendants (as defined below) purchased 27.4 million Endeavor shares in just three weeks, many on the final trading day before the Merger closed. For a large portion of these shares, the Icahn Defendants paid over $29 per share, an amount at least 5% higher than the Merger consideration, absorbing an estimated immediate loss of $40 million as the price of admission to arbitrage litigation. The Icahn Defendants, too, only ever filed a Schedule 13G. A self-described activist investor who purchases nearly 30 million shares in the final days of trading is not eligible to file a Schedule 13G.

7. The evidence of coordination among these named Defendants, and with a sizeable group of Doe Defendants, is substantial. Defendants' legal counsel has publicly acknowledged assembling an "appraisal group" and hosting investor roundtables to recruit participants. The same lawyers represent multiple defendant-petitioner groups. Key personnel, including Jonathan Christodoro (Mr. Icahn's longtime associate, now President of Troluce Capital) and a network of former colleagues at Troluce Capital and other hedge funds, connect these entities. The pattern of trading and litigation activity reflects a unified strategy executed across these nominally separate funds. Under the Williams Act, when two or more persons agree, even informally, to act together to acquire more than five percent of a registered equity security, they are a "group" and must at minimum identify every member of the reporting group and list the number and description of the

shares in which the group has an interest, and the nature of that interest. *See* 15 U.S.C. § 78m(d)(3); 17 C.F.R. § 240.13d-5(b). Defendants collectively formed such a group and failed to disclose it.

8. Defendants' initial violations have had far-reaching consequences. Because they never made the required disclosures, Defendants were subject to "cooling-off" periods that prohibited further share acquisitions. *See* 17 C.F.R. §§ 240.13d-1(e)(2), (f)(2). Defendants ignored those restrictions and continued buying. Every share purchased during the cooling-off period was acquired in violation of federal law, yet Defendants now claim the right to pursue billions of dollars in damages or appraisal entitlement based on those very shares that they should not have been permitted to accumulate in the first place.

9. Further, by collectively accumulating more than 10% of Endeavor's Class A common stock, members of the Arbitrage Group became statutory insiders of Endeavor under Section 16(b) of the Exchange Act. *See* 15 U.S.C. § 78p(a)(1). That provision strictly prohibits insiders from buying and then selling shares at a profit within six months, thus prohibiting insiders from making "short-swing" profits through leveraging their informational advantage over other public investors. *Id.* § 78p(b). And yet members of the Arbitrage Group continued to buy Endeavor stock for the express purpose of obtaining an appraisal valuation or fiduciary award at a price which—according to their own allegations—would net them millions of dollars of short-swing profits.

10. Accordingly, this action seeks a declaration that Defendants' illegally obtained shares were acquired in violation of the federal securities laws; disgorgement of any profits obtained from those shares; an injunction prohibiting further violations of the securities laws and further profiting through use of the illegally acquired shares or an order requiring divestiture of the shares; a declaratory judgment that Defendants shall be obligated to disgorge whatever

additional short-swing profits Defendants obtain through litigation; and any other equitable relief the Court deems proper.

## II. PARTIES

### A. Plaintiff

11. Plaintiff Endeavor Group Holdings, Inc. is a Delaware corporation with its principal place of business in Beverly Hills, California.

### B. The Troluce Defendants

12. Defendant Troluce Nexus Fund LP is a Cayman Islands exempted limited partnership and a hedge fund. Defendant Troluce Special Opportunities II, LP is a Delaware limited partnership with its principal place of business in Puerto Rico. The Troluce Defendants are petitioners in the Appraisal Action. Non-party Troluce Capital is a Puerto Rico (USA) limited liability company headquartered in Dorado, Puerto Rico, and is the investment advisor to the Troluce Defendants. On information and belief, Troluce Capital is the beneficial owner of the Troluce Defendants' assets. Troluce Capital was established in 2021 and, as of May 2026, had approximately $2.2 billion in regulatory assets under management.

13. Defendant Jared Dubin ("Dubin") is the managing member of Troluce Capital and serves as its Chief Investment Officer. Mr. Dubin was himself a Schedule 13G filer, and signatory for the other Troluce Defendants.

### C. The Icahn Defendants

14. Icahn Enterprises L.P. ("Icahn Enterprises" or "IEP"), Icahn Partners LP ("Icahn Partners"), and Icahn Partners Master Fund LP ("Icahn Master Fund," and together, the "Icahn Entities") are each Delaware limited partnerships with their principal places of business in Sunny Isles Beach, Florida and are each lead plaintiffs in the Fiduciary Action, seeking quasi-appraisal

damages for their Endeavor shares. The Icahn Entities were established in 1987 and, as of March 2026, held approximately $12.9 billion in total assets.

15. Defendant Carl Icahn (together with the Icahn Entities, the "Icahn Defendants") indirectly owns and controls Icahn Enterprises G.P. Inc., the general partner of Icahn Enterprises. Mr. Icahn is a billionaire activist investor with a long history of litigation targeting Silver Lake transactions. Mr. Icahn was himself a Schedule 13G filer.

**D. Doe Defendants**

16. In addition to the named Defendants, the Arbitrage Group included other members that Plaintiff cannot yet identify in this pleading. Dozens of other investment funds have also demanded appraisal for significant blocks of shares; have communicated with and/or retained common legal counsel in connection with their appraisal demands; and/or have significant personnel or other connections with the named members of the Arbitrage Group that indicate their membership therein.

17. Upon information and belief, these unnamed Doe Defendants also belong to the Arbitrage Group and are in violation of their obligations under federal securities law. Plaintiff reserves its right to amend this Complaint to name these Doe Defendants as they are identified in discovery in this Action.

## III. JURISDICTION AND VENUE

18. The claims asserted herein arise under and pursuant to Sections 13(d) and (g) of the Exchange Act (15 U.S.C. §§ 78m(d) and (g)) and SEC Rule 13d-1 promulgated thereunder (17 C.F.R. § 240.13d-1), and Section 16(b) of the Exchange Act (15 U.S.C. § 78p(b)).

19. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

20. This Court has personal jurisdiction over each Defendant, including Defendants organized outside the United States, under Section 27 of the Exchange Act, which authorizes nationwide service of process, because each Defendant has sufficient contacts with the United States, including by purchasing Endeavor shares on the New York Stock Exchange. *See* 15 U.S.C. § 78aa.

21. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), because from its IPO until the Merger closed, Endeavor's stock traded on the New York Stock Exchange and because the Troluce Defendants conduct business in and maintain operations within this District.

22. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including interstate telephone communications, and the facilities of a national securities exchange.

## IV. LEGAL BACKGROUND

### A. <u>The Williams Act's Scope and Purpose</u>

23. Section 13(d) of the Exchange Act (enacted as part of the Williams Act) requires any person or group that acquires direct or indirect beneficial ownership of more than 5% of a registered equity security to publicly file a detailed disclosure with the SEC within five business days of the acquisition. 15 U.S.C. § 78m(d)(1), (3); 17 C.F.R. § 240.13d-1(a).

24. Section 13(d) is a strict liability provision with no intent requirement.

25. Section 13(d)'s disclosure requirements were designed to ensure market transparency and protect investors. In the words of Senator Harrison Williams, sponsor of the Williams Act, Section 13(d)'s disclosure requirements are "the only way that corporations, their shareholders and others can adequately evaluate . . . the possible effects of a change in substantial

shareholdings."[1] Section 13(d) was intended to "alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of technique employed." *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971), *cert. denied*, 406 U.S. 910 (1972).

26. Applicable case law confirms this purpose. As the Second Circuit explained in *GAF Corp.*, "[S]ection 13(d) was intended to alert investors to potential changes in corporate control so that they could properly evaluate the company in which they had invested or were investing. Disclosure which is false or misleading subverts this purpose." 453 F.2d at 720.

27. Schedule 13D filings are important market indicators. Because they reveal information about investors' intentions and significant market activity, Section 13(d) filings are carefully tracked by investors, including through a large number of Schedule 13D tracking websites, which provide readers with information about recent Schedule 13D filings by prominent investors and which suggest that these filings can prompt copycat investor behavior.[2]

28. In light of the well-known disclosure requirements of Section 13(d), "an intentional failure to disclose beneficial ownership information when disclosure was expressly required signals falsely to investors that there is no such ownership to disclose." *Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *6 (S.D.N.Y. Mar. 30, 2021).

**B. <u>Timing Obligations Under Section 13(d)</u>**

29. Qualifying persons or groups must file a Schedule 13D (or Schedule 13G) within five business days of acquiring more than 5% of a registered equity security. 17 C.F.R. § 240.13d-1(a), (c).

---

[1] Kristin Giglia, Note, *A Little Letter, a Big Difference: An Empirical Inquiry Into Possible Misuse of Schedule 13G/13D Filings*, 116 Colum. L. Rev. 105, 111 (2016) (citing 113 Cong. Rec. 855 (1967) (statement of Sen. Williams)).

[2] Giglia, *supra* note 1, at 120 & n.90 (aggregating tracking websites).

30. An amended Schedule 13D must be filed within two business days of any "material change" in the information disclosed. 17 C.F.R. § 240.13d-2(a). In this context, "material change" includes ownership changes of 1% or more, and ownership changes of less than 1% "depending upon the facts and circumstances." *See id*.

31. The addition of a new member to a Section 13(d) group is a "material change" requiring an amendment within two business days.[3]

32. If an eligible person or group files a Schedule 13G but then loses their Schedule 13G eligibility (*i.e.*, they start acquiring securities in connection with a transaction affecting the control of an issuer or with the intent to evade Section 13(d)'s disclosure requirements), they must file a Schedule 13D within five business days of losing such eligibility, and then amend it accordingly.

### C. <u>Disclosure Obligations of Investors Who Acquire Stock in Connection with a Change-in-Control Transaction</u>

33. Section 13(d) mandates that an entity or group must file either a Schedule 13G or Schedule 13D, depending on the volume of their holdings and their intentions. 17 C.F.R. § 240.13d-1(a)–(d).

---

[3] *See* SEC Div. of Corp. Fin., *Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting*, Question 104.06 (July 11, 2025) ("Question: Are individual security holders that separately report on Schedule 13D required to amend their Schedules 13D when they later form a group together under Section 13(d)(3) of the Exchange Act? Answer: Yes. The security holders are required to amend their Schedules 13D because becoming a member of a group constitutes a material change under Rule 13d-2(a). The security holders may file separate amendments to their individual Schedules 13D, which would also satisfy the group's reporting obligation pursuant to Rule 13d-1(k)(2). Alternatively, they may file a joint Schedule 13D under Rule 13d-1(k)(1). The joint filing would constitute an initial Schedule 13D by the newly-formed group, but the group is required to file the Schedule 13D within two business days under Rule 13d-2(a) rather than within five business days of the group's formation since the report is intended to amend the three previously filed individual Schedules 13D.").

34. As relevant here, when a person or group with 5–20% ownership "acquire[s] . . . securities with any purpose, or with the effect, of changing or influencing the control of the issuer, or in connection with or as a participant in any [change-in-control] transaction," then the more onerous Schedule 13D is required. *See* 17 C.F.R. § 240.13d-1(c)(1).

35. Schedule 13D, unlike short-form Schedule 13G, requires disclosures of any "plans or proposals" that "relate to," *inter alia*: "[a]n extraordinary corporate transaction," "[a]ny other material change in the issuer's business or corporate structure," or any event that would "[cause] a class of securities of the issuer to be delisted from [an exchange] . . . or [a]ny action similar." *See* 17 C.F.R. § 240.13d-101 (Schedule 13D, Item 4). In addition, Item 6 of Schedule 13D requires disclosure of contracts, arrangements, understandings, and relationships by the reporting person with respect to any securities of the issuer, including with respect to voting of any securities. *Id.* (Item 6).

**D. Professional Risk Arbitrageurs Must File a Schedule 13D**

36. When an investor buys or sells the securities of a company that is the subject of a pending change of control transaction, it is said to be engaged in "risk arbitrage." *See, e.g.*, *Trane Co. v. O'Connor Sec.*, 561 F. Supp. 301, 302 (S.D.N.Y. 1983) ("risk arbitrage" is "the purchase and sale of the securities of companies involved in extraordinary transactions, such as reorganizations, liquidations, mergers and tender offers"); *United States v. Marcus Schloss & Co.*, 1988 WL 140794, at *1 n.1 (S.D.N.Y. Dec. 20, 1988) ("risk arbitrage [is] trading in the securities of companies that are the subject of proposed or anticipated corporate takeovers").

37. For more than forty years, the SEC has interpreted Rule 13d-1 to require investors engaged in risk arbitrage to disclose their qualifying purchases on the more extensive Schedule 13D rather than on the shorter Schedule 13G. *See* Colish, Faith, SEC Staff No-Action Letter, Fed. Sec. L. Rep. ¶ 76,397 (Mar. 24, 1980) (the "Faith Colish No-Action Letter") ("[W]e are unable to

conclude that acquisitions by professional risk arbitrageurs, when made after a public announcement of a tender offer or proposed tender offer, are ***not*** made in connection with any transaction having the effect of changing control of the issuer.") (emphasis added).

38. As the SEC has explained, where investors "acquire ownership of securities for the purpose of influencing the direction or management of an issuer or affecting or influencing the outcome of a transaction (such as acquiring shares for the primary purpose of voting those shares in a contemplated merger)," a Schedule 13D filing is required. *Perry Corp.*, Exchange Act Release No. 60351, 2009 WL 2163550 (July 21, 2009).

39. The Faith Colish No-Action Letter is frequently cited by market participants, including sophisticated institutional investors, as the basis for their Schedule 13D filings, demonstrating investors' understanding that merger arbitrage and event-driven investment strategies render an investor ineligible to report on Schedule 13G even where the investor itself has no purpose or intent to influence control of the issuer.[4]

### E. <u>Informal Coordination Can Create a "Group" Requiring Section 13(d) Disclosure</u>

40. Section 13(d)'s disclosure requirements apply to any person *or group* that acquires direct or indirect beneficial ownership of more than 5% of a registered equity security.

[4] *See, e.g.*, D.E. Shaw & Co., L.P., Schedule 13D (Nov. 21, 2025) (converting from Schedule 13G to 13D filing, and explaining that "due to the position taken by the SEC in the 'Faith Colish' No-Action Letter . . . it is possible that the Reporting Persons may not be eligible to continue reporting this position on" Schedule 13G); Point72 Asset Mgmt., L.P., Schedule 13D (Dec. 2, 2015) (even though "[t]he Reporting Persons acquired the shares of Common Stock . . . in the ordinary course of business, and not with the purpose nor with the effect of changing or influencing the control or management of the Issuer," because "[they] acquired the shares of Common Stock pursuant to investment strategies, including merger arbitrage and event driven strategies, because they believed that the shares of Common Stock," and "the transactions contemplated . . . may be deemed to constitute a change of control of the Issuer, the Reporting Persons may not be eligible to report this position on a Schedule 13G, notwithstanding such investment intent"); TFG Asset Mgmt. UK LLP, Schedule 13D (Dec. 8, 2022); Fir Tree Inc., Schedule 13D (Sept. 2, 2016).

41. Even the Schedule 13G short-form filing requires the filer to identify whether it is a group or part of a group, to identify every member of the reporting group, and to list the number and description of the shares in which the group has an interest, and the nature of that interest. A qualifying person or group must file a Schedule 13G within five business days of acquiring more than 5% of a registered equity security. An entity or group must file the long-form Schedule 13D if it acquires 20% or more of a registered equity security. *See* 17 C.F.R. § 240.13d-1(f)(1).

42. A "group" is defined in Rule 13d-5 as "two or more persons [that] agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer." 17 C.F.R. § 240.13d-5(b)(1)(i); *see also* 15 U.S.C. § 78m(d)(3) (group is deemed a statutory "person" "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer").

43. The Second Circuit has explained that "the touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective." *Roth v. Jennings*, 489 F.3d 499, 508 (2d Cir. 2007). The agreement need not be formal or written. *See Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 617 (2d Cir. 2002). Nor need the agreement concern "an agreement to gain corporate control or to influence corporate affairs," *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 124 (2d Cir. 2001), or indeed, stock acquisition "on any specific set terms," *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982).

44. Rather, a group is formed based on any "formal *or informal* understanding between" parties "for the purpose of acquiring, holding, or disposing of securities." *Hallwood*, 286 F.3d at 617 (emphasis added).

45. "[T]he existence of a group may be shown by circumstantial evidence, including prior relationships and trading patterns, discussions between the defendants, and evidence of a

particular *modus operandi*." *Burt v. Maasberg*, 2014 WL 1291834, at *18 (D. Md. Mar. 28, 2014) (quoting *Hallwood*, 286 F.3d at 617–18); *see also Augenbaum v. Anson Invs. Master Fund LP*, 2025 WL 2780854, at *6 (S.D.N.Y. Sept. 30, 2025) ("Courts across the country have consistently held that communication between security holders can be evidence of an agreement.").

46. The SEC has promulgated extensive guidance to help market participants understand when specific factual circumstances result in the formation of a Section 13(d) group. Among other indicia, the SEC has stated that a Section 13(d) group may be formed when the beneficial owner of a significant portion of a company's stock (*i.e.*, an owner who is or will be required to make a Section 13(d) filing) informs other market participants that such a filing will be made with the purpose of getting them to buy the company's stock and at least one does. Modernization of Beneficial Ownership Reporting, 88 Fed. Reg. 76896, 76935 (Nov. 7, 2023) (codified at 17 C.F.R. pts. 232, 240).

47. The SEC has issued specific guidance to stockholders who retain a common adviser, stating that "major shareholders" that retain the same investment adviser for the purpose of gaining influence over a company's management decision on a rights offering constitute a Section 13(d) group.[5]

48. Courts have likewise recognized that shareholders' use of a common adviser or counsel to coordinate their positions is probative circumstantial evidence of group formation. *See, e.g.*, *Schaffer ex rel. Lasersight Inc. v. CC Invs., LDC*, 2002 WL 31869391, at *6 (S.D.N.Y. Dec.

[5] *See* SEC Div. of Corp. Fin., *Exchange Act Sections 13(d) and 13(g) and Regulation 13D-G Beneficial Ownership Reporting*, Question 107.01 (July 11, 2025) ("[M]ajor shareholders have formed a group under Section 13(d)(3) because they acted as a group for the common purpose or goal of holding their securities. The major shareholders' joint decision to retain an investment advisor in a collective attempt to gain influence over a management decision with respect to a rights offering accordingly requires that the security holdings of the major shareholders be aggregated and reported on a Schedule 13D.").

20, 2002) ("extensive pattern of reliance on the common legal services . . . presents a legitimate basis upon which a rational trier of fact could reasonably infer agreement") (citing *Champion Parts Rebuilders, Inc. v. Cormier Corp.*, 661 F. Supp. 825, 843 (N.D. Ill. 1987) (investors' reliance on legal services of a common lawyer and splitting of that lawyer's fees evinced agreement and group action)).

49. Most recently, on October 7, 2026, the SEC issued a report reaffirming that the agreement, arrangement, understanding, or concerted action underlying the formation of a group "may be implied," and that coordinated conduct "even when undertaken through an intermediary" may "implicate the beneficial ownership reporting framework."[6] The SEC emphasized that "[w]hile shareholders may deny the existence of a group, such denials are not conclusive as to whether a group has formed," *id.* at 2, and that "[a] disclaimer by a member . . . regarding its potential participation in a 'group' would not prevent the formation of a group if, despite such a disclaimer, the evidence shows the existence of an explicit or implicit agreement," *id.* at 16. The SEC further explained that "intermediary-based arrangements cannot be used to shield coordinated actions and influence from the disclosure obligations imposed by Sections 13(d) and 13(g)," *id.* at 19–20, and identified relevant factors indicative of group formation, including "prior relationships among members," "a single member of the group negotiating on behalf of the others," and "communications among the members of the group about acquiring, holding, voting or disposing of the stock," *id.* at 15.

[6] Climate Action 100+ and the Election of Directors at the May 2021 Annual Meeting of ExxonMobil Corporation, Exchange Act Release No. 106611, at 1–2 (Oct. 7, 2026).

### F. The Williams Act's Accumulation Restrictions and "Cooling Off" Requirements

50. Section 13(d) contains additional features that limit investors from rapidly accumulating positions without full disclosure. For example, SEC Rule 13d-1(e)(2) restricts trading and imposes a ten-day "cooling-off" period when a person or group acquires securities "in connection with" a change of control transaction, triggering a Schedule 13D filing requirement. 17 C.F.R. § 240.13d-1(e)(2). SEC Rule 13d-1(f)(2) imposes a similar "cooling-off" period when a person or group acquires 20% or more of a registered equity security. *Id*. § 240.13d-1(f)(2). These cooling-off periods run from the triggering event (*e.g.*, crossing the 5% ownership threshold of a registered security in connection with a change of control transaction, or crossing the 20% ownership threshold) until ten days after the filing of a Schedule 13D. *See id.* §§ 240.13d-1(e)(2), (f)(2).

### G. Recourse for Violations of Section 13(d)

51. Courts have issued injunctions preventing defendants from acquiring additional shares or requiring rescission or disgorgement where defendants violate their Section 13(d) obligations, including violations of the prescribed trading limitations in Rule 13d-1. These remedies reflect the seriousness of a failure to disclose under Section 13(d).[7]

[7] *See, e.g., Fin. Gen. Bankshares, Inc. v. Lance*, 1978 WL 1082, at *13 (D.D.C. Apr. 27, 1978) ("These shareholders, who sold their stock without knowledge that these purchasers were acquiring a large block of FG stock and were considering seeking control of FG, will be irreparably injured unless defendants offer them rescission before defendants obtain control of FG."); *Gen. Steel Indus., Inc. v. Walco Nat'l Corp.*, [1981-82 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 98,402 (E.D. Mo. Nov. 24, 1981) (preliminarily enjoining the acquirer's partial tender offer until it offered rescission to all shareholders who sold on the open market while it was out of compliance with Section 13(d)); *S.E.C. v. First City Fin. Corp.*, 890 F.2d 1215, 1217 (D.C. Cir. 1989) (affirming order enjoining defendants from further violations of Section 13(d) and ordering disgorgement of all profits derived from the violation); *S.E.C. v. Teo*, 2011 WL 4074085 (D.N.J. Sept. 12, 2011), *aff'd*, 746 F.3d 90 (3d Cir. 2014) (issuing injunction against future violations of Section 13(d) and ordering disgorgement); *S.E.C. v. Bilzerian*, 814 F. Supp. 116, 124 (D.D.C.

### H. <u>Disgorgement of Short-Swing Profits Under Section 16(b)</u>

52. Section 16(b) of the Exchange Act provides that officers, directors, and holders of more than 10% of any covered security shall be liable to the company for "any profit" realized from "any purchase and sale, or any sale and purchase" of such security occurring "within any period of less than six months." 15 U.S.C. § 78p(b).

53. In other words, any group—as defined under Section 13(d), *see supra* § IV.E—that holds more than 10% of a company's securities is deemed a corporate "insider" that is obligated to disgorge to the company any "short-swing" profits—*i.e.*, any profits it realizes on securities held for less than six months. *See* 15 U.S.C. § 78p(b). The SEC has recently cautioned that the loss of Schedule 13G eligibility for holders exceeding 10% may result in "short-swing profit disgorgement liability under Section 16(b)." Climate Action 100+, *supra* note 6, at 23.

54. Section 16(b) is a strict liability statute that reaches "any profit" realized from "any purchase and sale" within six months, "without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information." *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 251 (1976) (internal quotation marks omitted); 15 U.S.C. § 78p(b).

55. Section 16(b) on its face contains no exception for insiders who buy into a pending merger, cross the 10% threshold, and then dispose of their shares through that merger. *See* 15 U.S.C. § 78p(b). Limited, judicially created exceptions to Section 16(b)'s strict liability regime have been recognized to protect stockholders from *involuntary*, forced dispositions. In *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582 (1973), the Supreme Court created

1993), *aff'd*, 29 F.3d 689 (D.C. Cir. 1994) (ordering disgorgement as remedy for failure to file timely disclosures).

a narrow exception for certain "unorthodox" transactions—there, a defeated tender offeror's forced exchange of shares in a defensive merger that it opposed and could not prevent. *Id.* at 593–600. The exception was created to protect insiders from liability in that unique posture: the Court stressed that the defendant had "no real choice" but to exchange its shares. *Id.* at 600. Correspondingly, several courts of appeals, including the Second Circuit, have recognized involuntariness as a necessary predicate to the *Kern County* exception. *See Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 46 (2d Cir. 2012) (explaining "an involuntary transaction . . . [is a] prerequisite[] to the *Kern County* analysis"); *Colan v. Mesa Petroleum Co.*, 951 F.2d 1512, 1522 (9th Cir. 1991) ("[A]bsent a showing of involuntariness, we would not be justified in applying the *Kern County* rule."); *Texas Int'l Airlines v. Nat'l Airlines, Inc.*, 714 F.2d 533, 539–40 (5th Cir. 1983) (declining to apply *Kern County* to a transaction "voluntarily entered into"); *Super Stores, Inc. v. Reiner*, 737 F.2d 962, 965 (11th Cir. 1984); *Gund v. First Fla. Banks, Inc.*, 726 F.2d 682, 686 (11th Cir. 1984).

56. *Kern County's* exception for involuntary dispositions has no application to stockholders who intentionally seek out a risk arbitrage strategy premised on an already-announced cash merger. When stockholders accumulate their position *after* a cash merger has already been announced, they have voluntarily entered into a scenario in which their holding will be exchanged for cash.

## V. FACTUAL BACKGROUND

### A. <u>The Endeavor Take-Private Transaction</u>

57. On April 2, 2024, Endeavor and affiliates of Silver Lake entered into an Agreement and Plan of Merger pursuant to which Silver Lake would acquire 100% of the outstanding shares of Endeavor it did not already own—around 63% of Endeavor's outstanding stock, other than rolled interests—for $27.50 per share in cash (the "Merger Agreement"). The transaction

represented an approximately 57% premium to Endeavor's unaffected closing stock price of $17.72 on October 24, 2023 (the last full trading day prior to Endeavor's announcement that it was reviewing strategic alternatives) and a 39% premium to Endeavor's unaffected 30-day VWAP. The $13 billion transaction was the then-largest private equity sponsor take-private in over a decade and the largest ever in the media and entertainment sector.

58. A special committee of Endeavor's independent directors, working with its own independent financial and legal advisors, met more than twenty times, rejected multiple proposals at lower prices, received a fairness opinion from Centerview Partners LLC, and unanimously recommended the transaction. The Merger was approved by written consent the same day the Merger Agreement was signed. On January 15, 2025, Endeavor filed a definitive information statement under Section 14(c) of the Exchange Act. The deadline to seek appraisal expired on February 4, 2025. Trading in Endeavor's Class A common stock ceased on March 21, 2025, and the Merger closed on March 24, 2025.

59. On March 3, 2025, Silver Lake publicly warned that "large blocks of shareholders ha[d] arbitraged the deal in order to demand appraisal" and that it "believe[d] that the pervasive trading by these hedge funds, many of whom accumulated substantial positions in the stock of Endeavor (and presumably also its public subsidiary, TKO Group Holdings, Inc.) only after the deal was announced, ha[d] caused an artificial increase in the stock price."[8] Silver Lake further stated that it "d[id] not intend to pay [dissenters] any merger consideration at closing - nor at any

[8] Press Release, Silver Lake, *Silver Lake To Close Endeavor Transaction On March 24th At $27.50* (March 3, 2025 8:37 AM), https://www.businesswire.com/news/home/20250303663576/en/Silver-Lake-To-Close-Endeavor-Transaction-On-March-24th-At-%2427.50.

time until there is full resolution with respect to such appraisal claims - consistent with its rights under Delaware law."[9]

60. "Appraisal arbitrage" is a species of merger arbitrage and risk arbitrage in which hedge funds purchase a target company's shares after a deal is announced, vote against or abstain from the transaction, and then petition the Delaware Court of Chancery for a judicial determination that the "fair value" of their shares exceeds the merger price. The strategy exploits Delaware General Corporation Law § 262, which entitles dissenting shareholders to receive the judicially determined "fair value" of their shares in lieu of the merger consideration. Under Delaware law, the concept of "fair value" for purposes of appraisal is "not equivalent to the economic concept of fair market value" but is instead "a largely judge-made creation, freighted with policy considerations." *In re Appraisal of Dell Inc.*, 2016 WL 3186538, at *21 (Del. Ch. May 31, 2016), *aff'd in part, rev'd in part sub nom. Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1 (Del. 2017).

61. In the merger context, arbitrageurs typically acquire target shares for one of two purposes: (i) to influence the outcome of the stockholder vote on the transaction, or (ii) as here, to capture the anticipated spread between the deal price and a judicially determined "fair value." Arbitrageurs pursuing the second strategy have a strong incentive to conceal their accumulations. Visible stockpiling could signal to the market that sophisticated investors view the deal as underpriced, inviting others to pile into the same appraisal play. That added demand would drive up the stock price and narrow the spread on which the strategy depends.

62. In *Dell*, and in the subsequent decision in *DFC Global Corp. v. Muirfield Value Partners, L.P.*, the Delaware Supreme Court put a damper on appraisal arbitrage activity by ruling

---

[9] *Id.*

that, ordinarily, the deal price will provide the best evidence of "fair value." *Dell*, 177 A.3d at 35; *DFC Global Corp.*, 172 A.3d 346, 367 (Del. 2017). Recently, however, appraisal arbitrage has seen a resurgence.

63. The Merger at issue here has become a focal point of this resurgence. Hedge funds, including Defendants, bought heavily into Endeavor's stock after the Merger was announced and have sought appraisal of roughly 149 million shares—approximately 80% of Endeavor's public float and over $4 billion worth of shares at the deal price—in what is now the largest appraisal proceeding in Delaware history. As one law review commentator noted, "top Wall Street players . . . are ***bringing appraisal arbitrage back*** in the Endeavor buyout."[10]

64. The effect of arbitrage activity was reflected in Endeavor's stock price, which traded above the $27.50 deal price for much of the period between the Merger announcement and closing, a clear market signal that arbitrageurs were accumulating shares in anticipation of appraisal proceedings (or fiduciary litigation) rather than for the purpose of receiving the Merger consideration. One analyst downgraded Endeavor from "Neutral" to "Sell" specifically because the shares were "trading far above the $27.50/share cash privatization offer," further confirming the market's understanding that the stock's inflated trading price was a product of arbitrage activity, not inherent value.[11]

---

[10] Marcus Lecky, *The Return of the Appraisal Arbitrage Trade*, Univ. Miami L. Rev. Insights (Mar. 23, 2026), https://lawreview.law.miami.edu/the-return-of-the-appraisal-arbitrage-trade/.

[11] TheFly, *Endeavor Group downgraded to Sell from Neutral at Seaport Research* (Feb. 11, 2025), https://www.tipranks.com/news/the-fly/endeavor-group-downgraded-to-sell-from-neutral-at-seaport-research.

## VI. SUBSTANTIVE ALLEGATIONS

### A. The Troluce Defendants' Risk Arbitrage Strategy and Deficient Schedule 13G Filings

65. The Troluce Defendants' SEC filings reflect an extraordinary concentration of their portfolio in Endeavor-related securities. For example, as of September 30, 2024, Troluce Capital's Form 13F portfolio disclosed holdings valued at approximately $1.7 billion, with Endeavor and TKO as its top two positions. Troluce Capital Advisors LLC, Institutional Investment Manager Holdings Quarterly Report (Form 13F-HR) (Nov. 14, 2024). By October 31, 2024, the Troluce Defendants' 15,450,000 shares of Endeavor, at a market price of approximately $29.49 per share, represented roughly 30% of the firm's portfolio.[12]

66. On November 1, 2024, shortly after the Troluce Defendants accumulated a position that constituted more than 5% of Endeavor's outstanding shares, Troluce Special Opportunities II, LP, Troluce Nexus Fund LP, Troluce Capital, and Mr. Dubin filed a Schedule 13G with the SEC under Rule 13d-1(c), a provision available only for passive investors whose acquisitions are made in the ordinary course of business and not in connection with a change of control transaction. *See* Troluce Capital Advisors LLC, Beneficial Ownership Report (Schedule 13G) (Nov. 1, 2024).

67. That filing, signed by Dubin on behalf of all four of the filing entities, disclosed that Troluce Capital, as the investment manager of Special Opportunities II and Nexus Fund, beneficially owned 15,450,000 shares of Common Stock, representing approximately 5% of the outstanding Common Stock based on 306,795,376 shares outstanding. *Id.* In that filing, each of the entities certified that "the securities referred to above were not acquired and are not held for

[12] GuruFocus, *Troluce Capital Advisors LLC Acquires New Stake in Endeavor Group Holdings Inc* (Nov. 1, 2024), https://www.gurufocus.com/news/2578886/troluce-capital-advisors-llc-acquires-new-stake-in-endeavor-group-holdings-inc.

the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect," and represented that none of them was part of any group. *Id.*

68. The representations in the filing were false. Troluce Capital is a professional risk arbitrageur that caused the Troluce Defendants to acquire their Endeavor position almost entirely after the Merger was announced, in connection with the pending change of control transaction. Troluce's purchases were made after the Merger was announced, their value depended on the Merger, and they were effected specifically to contest the Merger consideration through appraisal and fiduciary litigation.

69. Because the Troluce Defendants' purchases were part of a risk arbitrage strategy, they were not eligible for disclosure on Schedule 13G and instead required disclosure on a Schedule 13D. Yet the Troluce Defendants never filed any Schedule 13D in connection with their arbitrage-driven purchases of Endeavor stock.

70. By the time of the February 4, 2025 appraisal demand deadline, the Troluce Defendants had acquired more than 35.5 million Endeavor shares. On January 21, 2025, the Troluce Defendants filed an amended Schedule 13G reporting that they held approximately 11.5% of Endeavor's Class A common stock, and again represented that they were passive investors and were not members of any group. Troluce Capital Advisors LLC, Amended Beneficial Ownership Report (Schedule 13G/A) (Jan. 21, 2025). That certification was false for the same reasons outlined above, and it also concealed the Troluce Defendants' membership in the Arbitrage Group. *See id.*

71. Moreover, because the Troluce Defendants were required to report on Schedule 13D, they were barred from acquiring additional shares until they did so; therefore, all of the

Troluce Defendants' purchases above the 5% threshold—upwards of 6%, or roughly 20 million, of Endeavor's outstanding shares—were made in violation of Section 13(d)'s mandated cooling-off period.

72. The Troluce Defendants demanded appraisal for all of these shares, constituting approximately 24% of all shares for which appraisal was demanded (the largest single appraisal block by far).

73. The Troluce Defendants' decisions to (1) file on Schedule 13G despite Troluce Capital's arbitrage-driven investment strategy and (2) purchase additional shares during the pendency of a change in control transaction were thus both in violation of the Troluce Defendants' obligations under federal law, and a departure from a practice that participants in the merger arbitrage and risk arbitrage markets have understood and followed for decades.

### B. <u>The Icahn Defendants' Pattern of Activist Obstruction and Deficient Schedule 13G Filing</u>

74. Mr. Icahn has a long history of using litigation and activist campaigns to interfere with Silver Lake's transactions. For example, in 2013, he waged a campaign against Silver Lake and Michael Dell's $24.4 billion take-private of Dell, Inc., nominating a slate of directors that included Jonathan Christodoro (then a Managing Director at Icahn Capital L.P., and now President of Troluce Capital), suing in Delaware and urging fellow stockholders to demand appraisal because it would allow them to "have your cake and eat it too." He abandoned the fight in September 2013 and withdrew his own appraisal demands shortly thereafter.

75. Mr. Icahn has followed the same approach in deals involving other actors. In 2018, after acquiring nearly 10% of AmTrust Financial Services, he sued in Delaware and launched a proxy fight against its $2.7 billion take-private. In 2019, after building a large position in

Occidental Petroleum, he issued a demand for books and records regarding Occidental's acquisition of Anadarko; the Court of Chancery dismissed that action.

76. In short, Mr. Icahn's conduct follows a pattern: he accumulates a large stake in a company engaged in a significant transaction, then uses the threat of activism or litigation to seek improved terms, control over the transaction, or value above the deal price. The Icahn Defendants deployed the same playbook in Endeavor.

77. Mr. Icahn also has a documented history of Section 13(d) disclosure violations. On August 19, 2024 (just months before the Endeavor purchases at issue here), the SEC announced settled charges against Mr. Icahn and IEP, finding that IEP violated Section 13(a) of the Exchange Act of 1934 and Rule 13a-1 thereunder by failing to disclose information relating to Mr. Icahn's pledges of IEP securities as collateral to secure personal margin loans worth billions of dollars under agreements with various lenders, and that Mr. Icahn violated Section 13(d)(2) and Rule 13d-2(a) thereunder by failing to file amendments to Schedule 13D describing Mr. Icahn's personal margin loan agreements and amendments dating back to at least 2005. IEP and Mr. Icahn agreed to pay civil penalties of $1.5 million and $500,000, respectively.

78. The SEC enforcement action was itself prompted by a May 2023 report from short seller Hindenburg Research, which accused Icahn Enterprises of running "ponzi-like economic structures" and raised questions about Mr. Icahn's undisclosed borrowing. One day after the Hindenburg report was published, the U.S. Attorney's Office for the Southern District of New York contacted Icahn Enterprises "seeking production of information relating to it and certain of its affiliates' corporate governance, capitalization, securities offerings, dividends, valuation, marketing materials, due diligence and other materials," as disclosed in IEP's quarterly report on Form 10-Q.

79. That Mr. Icahn would proceed to acquire 27.4 million shares of Endeavor without filing the required Schedule 13D mere months after settling SEC charges for precisely the same type of disclosure failure is further evidence that his non-compliance was willful.

80. On March 26, 2025, Icahn Enterprises L.P. and Mr. Icahn filed a Schedule 13G with the SEC reporting ownership of 27,464,740 Endeavor shares held indirectly through Icahn Enterprises L.P.'s subsidiary entities Icahn Partners LP and Icahn Partners Master Fund LP, representing 8.44% of Endeavor's Class A common stock. Mr. Icahn signed the filing. In that filing, Icahn certified under Rule 13d-1(c) (which is available only for ordinary-course acquisitions not in connection with a change of control) that the shares were not acquired in connection with or as a participant in a change-in-control transaction, and represented that he was not a member of any group. This certification was false.

81. Indeed, the Icahn Defendants purchased 99% of their 27,464,740 shares after the February 4, 2025 appraisal demand deadline and approximately 80% of them on the last trading day, March 21, 2025. At over $29.00 per share (at least $1.50 above the $27.50 deal price), Icahn incurred an estimated loss of over $40 million on those purchases. The Icahn Defendants' strategy—to pay at least a 5% premium to the deal price and to absorb over $40 million in immediate losses—is only conceivable as an investment in litigation.

82. Because the Icahn Defendants purchased their Endeavor shares after the February 4, 2025 appraisal deadline, all shares were exchanged for $27.50 per share at closing, worth approximately $755 million. On July 3, 2025, Icahn joined a second amended complaint in the Fiduciary Action, and on July 10, 2025, moved to be appointed co-lead plaintiff. On September 29, 2025, the Court of Chancery granted the motion, while observing that Icahn "is a litigation arbitrageur rather than an aggrieved stockholder."

83. As merger arbitrageurs, the Icahn Defendants were not eligible to file a Schedule 13G. Yet they never filed any Schedule 13D in connection with their purchases of Endeavor stock.

### C. Evidence of Coordinated Group Activity

84. Despite certifying in their respective filings (if any) that they were not part of any group, Defendants, together with Doe Defendants, acted as a group within the meaning of Section 13(d).

85. The Arbitrage Group, which coalesced around the common purpose of pursuing a broad litigation attack on the Merger, formed shortly after the Merger was announced and grew through the recruiting efforts of Troluce and its counsel, ultimately drawing in the Icahn Defendants and various other investors. Because Defendants never disclosed their group membership, they also failed to abide by the mandatory cooling-off periods under the federal securities laws, and large portions of their share positions were therefore acquired in violation of law.

86. The Arbitrage Group's formation predates nearly all of its members' Endeavor purchases. Shortly after the Merger was announced, a hedge fund ("Fund A") identified an appraisal arbitrage opportunity but did not want to go it alone: it sought to "piggyback another investor on appraisal." Fund A eventually found a partner in the Troluce Defendants, led by Dubin (a former Fund A principal) and Christodoro (a former top Icahn lieutenant). Fund A and the Troluce Defendants discussed the Endeavor appraisal opportunity extensively, and within weeks the Troluce Defendants had purchased Endeavor stock, reporting to Fund A that their collective effort was a "[n]ice call."

87. The Troluce Defendants went on to invest close to a billion dollars in the Endeavor appraisal play, assuming a leadership role in recruiting and organizing other members of the Arbitrage Group. For example, the Troluce Defendants negotiated with attorneys who would

represent other appraisal arbitrageurs as well as the Troluce Defendants, touting their "30mm shares" and their "connectivity with material unsigned players . . . [*i.e.*,] other large holders that have not selected firms." On November 5, 2024—just four days after certifying on Schedule 13G that they were not members of any group—the Troluce Defendants were looking to grow their group and wanted "to speak with anyone who hasn't signed with a law firm yet." Other funds responded to the invitation, asking the Troluce Defendants for introductions.

88. The Troluce Defendants' recruiting efforts were amplified by their one-time counsel, Rolnick Kramer Sadighi LLP ("RKS"), the Arbitrage Group's most prolific coordinator. RKS's work on the Endeavor appraisal play began immediately after the Merger was signed. RKS "closely monitor[ed] the price of TKO's stock with the understanding and expectation that if it continued to rise, the viability of an appraisal proceeding would increase." During the same period, RKS "was approached by a global financial institution with specialized services in investment banking and capital markets and asked whether [RKS] would be willing to co-host an investor roundtable addressing a potential appraisal proceeding of Endeavor." As suggested by that global financial institution, RKS held investor roundtables beginning in June 2024 that brought together funds considering asserting appraisal claims against Endeavor.

89. Like the other law firms and service providers that marketed the Endeavor appraisal play, RKS had a direct economic incentive to grow the Arbitrage Group: the larger the coordinated group of co-petitioners it could assemble, the larger the fees it could charge and the greater its odds of winning the lead-counsel role. RKS understood that it needed "to amass an appraisal group of sufficient size" to make the economics of the appraisal play work, including when factoring in a contingency fee for itself. RKS's strategy was to build as large a group of prospective appraisal petitioners as possible, each of whom would pay RKS a contingency fee of 20 or 25 percent. To

grow its group, RKS incentivized major investors by offering a 10-million-share fee waiver—meaning they would only have to pay RKS in connection with their first 10 million Endeavor shares.

90. With RKS's assistance, Troluce and others succeeded in creating a group consisting of at least Troluce, Icahn, and several other funds dedicated to pursuing arbitrage investment strategies related to the Merger. Members of the Arbitrage Group shared information, coordinated trading strategy, discussed market pricing for large blocks of Endeavor stock, and negotiated prices on blocks of Endeavor stock, options, and attorneys' fees.

91. Notably, RKS's role in organizing the Arbitrage Group does not excuse its members from failing to identify themselves as such: the SEC has recently made clear that coordination through an intermediary acting as a "central hub" for organizing investors does not insulate the participants from group status.

92. Members of the Arbitrage Group also coordinated their hedging strategies. Members purchased put options to protect against the risk that the Merger would not close, and hedging strategies were discussed among the Arbitrage Group, pitched by investment advisors, and implemented by brokers. Indeed, the sole limited partner of Troluce Nexus Fund—a dedicated $220 million Endeavor appraisal arbitrage fund—contractually required Troluce to hedge its entire long exposure to Endeavor with put options. Appraisal petitioners discussed among themselves the litigation risk that shared hedging posed: one observed, "I know some guys didn't even want to buy 25 puts to avoid any issues in discovery"; another responded, "I think if that comes up in discovery . . . Can be dicey"; and a third added, "If these 25 puts screw us . . . ."

93. The Icahn Defendants' link to the Arbitrage Group runs through Jonathan Christodoro, Troluce Capital's President and Mr. Icahn's longtime collaborator. Mr. Christodoro

was formerly a Managing Director at Icahn Capital L.P. and has been widely recognized as one of Mr. Icahn's key lieutenants, serving on at least eleven boards at Mr. Icahn's designation, including serving as Mr. Icahn's representative on the Herbalife board. Mr. Christodoro and Mr. Icahn have also been linked in prior regulatory and litigation matters: the SEC's 2023 settlement with Lyft, Inc. concerned a pre-IPO sale of Lyft shares by Mr. Icahn through a vehicle managed by Mr. Christodoro, Mr. Icahn's designee on Lyft's board. And Mr. Christodoro and Mr. Icahn were defendants in *Miami Firefighters' Relief & Pension Fund v. Icahn*, a fiduciary duty action relating to Xerox Holdings Corporation that settled for $2.2 million.[13]

94. That relationship is reflected in the Icahn Defendants' coordination with the Troluce Defendants, including at a January 23, 2025 "Appraisal for Dummies" meeting attended by several representatives of Icahn, Troluce, and RKS. That meeting occurred just two days after the Troluce Defendants filed an amended Schedule 13G again disclaiming membership in any group, and before the Icahn Defendants made 99% of their Endeavor purchases.

95. On information and belief, the Icahn Defendants and the Troluce Defendants engaged in an undisclosed scheme to jointly control litigation across the Appraisal and Fiduciary Actions. Mr. Christodoro's firm, Troluce Capital, manages the Troluce Defendants, which hold the largest Endeavor stock position and are the lead petitioners in the Appraisal Action. And the Icahn Defendants' eleventh-hour share purchases at prices well above $27.50 per share,

---

[13] *In re Lyft, Inc.*, Exchange Act Release No. 98413 (Sept. 18, 2023); Austin Weinstein & Bloomberg, *Lyft Agrees to $10 Million Settlement for Allegedly Failing to Disclose That Carl Icahn Sold Shares to George Soros Just Before the Company's IPO*, Fortune (Sept. 18, 2023, 7:02 PM ET), https://fortune.com/2023/09/18/lyft-fine-ipo-share-sale/; Stipulation of Settlement, *Miami Firefighters' Relief & Pension Fund v. Icahn*, Index No. 657447/2019 (N.Y. Sup. Ct. May 6, 2024); *Miami Firefighters' Relief & Pension Fund v. Icahn*, 2025 NY Slip Op 35065(U) (N.Y. Sup. Ct. Dec. 23, 2025) (approving settlement).

guaranteeing the Icahn Defendants an immediate loss on their investment, enabled the Icahn Defendants to become lead plaintiffs in the Fiduciary Action.

96. RKS itself has effectively conceded that its clients, in coordination with more yet-to-be-identified arbitrageurs, acted as an undisclosed group. In seeking a position as lead counsel in the Appraisal Action in 2026, RKS described the group dynamic at play while Endeavor's stock continued to trade, admitting to the Court that during that period, "[a]fter literally hundreds of calls with clients, we succeeded in creating a group of investors committed to appraising their shares prior to the deadline for perfecting appraisal rights."

97. Lead counsel for the petitioners in the Appraisal Action likewise admitted that Defendants engaged in coordinated activity related to their investments in the Endeavor appraisal play, including "communications concerning appraisal strategy, litigation planning, investment opportunities, and professional relationships." Defendants also admit they discussed "appraisal economics, opportunities to 'trade notes' with other investors, [and] potential participation in litigation vehicles," all in furtherance of their common objective of pursuing a coordinated Endeavor appraisal play.

98. These admissions demonstrate that the Arbitrage Group coordinated for the purpose of acquiring Endeavor securities within the meaning of Section 13(d) and Rule 13d-5. Their failure to disclose the existence of the Arbitrage Group and the identity and information of its members violated the law.

99. The Arbitrage Group ultimately amassed more than 20% of Endeavor's stock, and by the appraisal deadline there was nearly no liquidity left in Endeavor stock and nearly no remaining legacy stockholders. Because no group disclosure was ever filed, Endeavor did not learn the true scale of the appraisal campaign until the February 4, 2025 demand deadline, and still

has not uncovered the extent of the Arbitrage Group's coordination. Had the required filings been made, Endeavor would have learned about the scope of the appraisal play far earlier and could have responded appropriately, including by seeking enforcement of the federal securities laws to prevent additional accumulations in violation of statutory cooling-off periods and disgorgement of short-swing profits.

### D. <u>The Troluce and Icahn Defendants and Other Members of the Arbitrage Group Claim Entitlement to Short-Swing Profits Subject to Disgorgement</u>

100. The Troluce Defendants crossed the 10% ownership threshold by January 21, 2025, at the latest (and in all likelihood far earlier), at which time the Troluce Defendants' Schedule 13G filed that day revealed that *they alone* owned 11.5% of Endeavor's outstanding stock. Therefore, the Troluce Defendants and other members of the Arbitrage Group were statutory "insiders" subject to Section 16(b) by January 21, 2025.

101. The Arbitrage Group's dispositions were decidedly not involuntary. Members of the Arbitrage Group bought into an announced deal *to seek appraisal*. They purchased *knowing* that the Merger would cash out their shares within six months. Insiders who buy after a merger is announced, with the disposition date and price already fixed, do not resemble the stockholder "forced to sell" in *Kern County*.

102. Nor were the Arbitrage Group's dispositions of their stock via appraisal unorthodox or involuntary, as the judicially created doctrine set forth in *Kern County* was intended to address. A "decision to exercise [appraisal] rights . . . constitute[s] a voluntary election by [petitioner] to exchange its shares . . . for cash." *Heublein, Inc. v. Gen. Cinema Corp.*, 559 F. Supp. 692, 699 (S.D.N.Y. 1983). Therefore, a cash-out merger in which the holder affirmatively elects appraisal *after a merger has already been announced* more closely resembles the "garden variety" stock-for-cash transaction that Section 16(b) was written to reach. *See id.* at 700 n.13 ("The exercise of

appraisal rights obviously has more in common with the 'garden variety' stock-for-cash sale than does an exchange pursuant to a merger. First, it is a voluntary choice and second, it results in the liquidation of an investment rather than merely a change in its character.").

103. Therefore, by crossing the 10% ownership threshold months after the Merger's announcement and subsequently electing to seek appraisal of their Endeavor shares, the Troluce Defendants, the Icahn Defendants, and other members of the Arbitrage Group who sought appraisal bound themselves to sell those shares at a "fair value" to be determined as of March 24, 2025—a date within six months of the majority of their purchases. If the "fair value" of Defendants' Endeavor shares exceeds the price at which they acquired those shares, then the profit Defendants stand to receive as a result of the appraisal constitutes a short-swing profit that is subject to disgorgement under Section 16(b).

104. Under the "lowest-in, highest-out" method that courts use to calculate short-swing profit, such profit is measured by matching the group's lowest-priced qualifying purchase to the highest qualifying sale price. If, upon resolution of the Appraisal Action, the fair value of the group's Endeavor shares as of March 24, 2025 is determined to be greater than the lowest price at which the group acquired Endeavor shares in the six months prior to the appraisal date, the resulting short-swing profit inures to, and is recoverable by, Endeavor as the issuer of the stock in question.

105. Accordingly, the Troluce Defendants, Icahn Defendants, and other members of the Arbitrage Group are in violation of Section 16(b) to the extent they have already obtained short-swing profits in connection with sales of Endeavor stock after the Arbitrage Group crossed the 10% ownership threshold, and must disgorge those and any additional short-swing profits they obtain as a result of the Appraisal Action.

## VII. FIRST CAUSE OF ACTION

**Violations of Section 13(d) of the Securities Exchange Act of 1934**
**(Against All Defendants)**

106. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

107. Defendants violated Section 13(d) of the Exchange Act and Rule 13d-1 promulgated thereunder by, among other things: (i) failing to disclose their status as non-passive investors and failing to make the accompanying Schedule 13D disclosures required under Section 13(d) and the rules promulgated thereunder; and (ii) failing to disclose the formation of a group and the identity and information of the group members, as required by Section 13(d) and Rule 13d-5.

108. Defendants further violated the cooling-off period established by Rule 13d-1 by continuing to acquire Endeavor shares after triggering the applicable thresholds without filing the required Schedule 13D disclosures:

109. The Troluce Defendants and the Icahn Defendants both crossed the 5% ownership threshold in connection with or as a participant in a change of control transaction without filing a Schedule 13D, thereby triggering a cooling off period under 17 C.F.R. § 240.13d-1(e) that prohibited further share acquisitions until ten days after the filing of a Schedule 13D. No such filing was ever made, and the cooling off period therefore never concluded.

110. Upon information and belief, the Arbitrage Group itself exceeded the 20% ownership threshold by the appraisal deadline of February 4, 2025, without any member filing the required notice, thereby triggering an additional cooling off period under 17 C.F.R. § 240.13d-1(f) that prohibited further share acquisitions until ten days after the filing of a Schedule 13D. No such filing was ever made, and the cooling off period therefore never concluded.

111. Absent the required filings, those cooling off periods never concluded. Defendants' violations are continuing and will cause irreparable injury to Plaintiff and to the integrity of the securities markets absent equitable intervention by this Court.

## VIII. SECOND CAUSE OF ACTION

### Violations of Exchange Act Section 16(b), 15 U.S.C. § 78p(b) — Failure to Disgorge Short-Swing Profits
### (Against the Troluce Defendants, Icahn Defendants, and Doe Defendants)

112. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

113. As the issuer of the underlying security, Endeavor has standing to seek relief for violations of Section 16(b) of the Exchange Act, 15 U.S.C. § 78p(b).

114. At all relevant times, the common stock of Endeavor was registered pursuant to Section 12(b) of the Exchange Act, 15 U.S.C. § 78l.

115. The Troluce Defendants, Icahn Defendants, and certain Doe Defendants are members of the Arbitrage Group. By no later than January 21, 2025, the Arbitrage Group had acquired more than 10% of the stock of Endeavor, rendering the Troluce Defendants, Icahn Defendants, and certain members of the Arbitrage Group "insiders" under Section 16(b) of the Exchange Act. As insiders, members of the Arbitrage Group who sold their Endeavor stock for a profit are required to disgorge short-swing profits resulting therefrom to Endeavor.

## IX. THIRD CAUSE OF ACTION

### Declaratory Judgment of Short-Swing Profits and Future Right to Disgorgement
### (Against the Troluce Defendants, Icahn Defendants, and Doe Defendants)

116. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

117. As issuer of the underlying security, Endeavor has standing to seek relief for violations of Section 16(b) of the Exchange Act, 15 U.S.C. § 78p(b).

118. At all relevant times, the common stock of Endeavor was registered pursuant to Section 12(b) of the Exchange Act, 15 U.S.C. § 78l.

119. The Troluce Defendants, Icahn Defendants, and certain Doe Defendants are members of the Arbitrage Group. By no later than January 21, 2025, the Arbitrage Group had acquired more than 10% of the stock of Endeavor, rendering the Troluce Defendants, Icahn Defendants, and certain members of the Arbitrage Group "insiders" under Section 16(b) of the Exchange Act.

120. The Troluce Defendants, Icahn Defendants, and certain Doe Defendants held shares of Endeavor stock as of the closing of the Merger on March 24, 2025 for which they seek to exercise an appraisal remedy. The Merger's closing constituted a sale of shares, the price of which will be determined through the Appraisal Action.

121. To the extent the court in the Appraisal Action determines the "fair value" of Endeavor shares exceeds $27.50, Defendants must disgorge to Endeavor any profits attributable to shares purchased within six months of the close of the Merger.

122. Defendants are believed to dispute their obligation to disgorge any short-swing profits.

123. An actual controversy exists between Plaintiff and Defendants with regard to Endeavor's disgorgement claim under Section 16(b) for short-swing profits obtained through the Appraisal Action.

124. Declaratory relief is necessary to preserve Endeavor's Section 16(b) recovery rights; without it, the Defendants may dissipate or transfer their appraisal proceeds during the

pendency of the Appraisal Action, leaving Endeavor unable to collect disgorgement once the per-share proceeds are determined and damages can be calculated.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants as follows by:

a. Declaring that Defendants have violated Section 13(d) of the Exchange Act and the rules promulgated thereunder;

b. Ordering disgorgement of all actual and prospective profits obtained by Defendants in excess of the $27.50 per share Merger consideration, including any recovery obtained or to be obtained in the Fiduciary Action, the Appraisal Action, or any related proceeding, including any awarded interest;

c. Ordering divestiture of all stock acquired by Defendants during any cooling off period in violation of 17 C.F.R. §§ 240.13d-1(e) and (f);

d. Temporarily, preliminarily, and permanently enjoining Defendants from (i) further violations of Sections 13(d) and 16(b) of the Exchange Act and the rules promulgated thereunder; and (ii) exercising any rights arising out of Endeavor stock acquired in violation of Section 13(d) or 16(b) and the rules promulgated thereunder, including standing to pursue appraisal or pursue fiduciary litigation premised upon ownership of such stock;

e. Requiring Defendants to disgorge all short-swing profits as required by Section 16(b) of the Exchange Act;

f. Declaring that any interest and short-swing profits realized in the Appraisal Action are subject to disgorgement under Section 16(b) of the Exchange Act;

g. Awarding Plaintiff its reasonable costs, attorneys' fees, and expenses incurred in this action; and

h. Granting such other and further equitable, injunctive, or other relief as the Court may deem just and proper.

Dated: October 28, 2026

Respectfully submitted,

**SIMPSON THACHER & BARTLETT LLP**

By: */s/ Stephen Blake*
Stephen Blake
Laura Lin
One Market Plaza
Spear Tower, Suite 3800
San Francisco, CA 94105
Telephone: (415) 426-7300
sblake@stblaw.com
laura.lin@stblaw.com

**LATHAM & WATKINS LLP**

Colleen C. Smith
12670 High Bluff Drive
San Diego, California 92130
Telephone: (858) 523-5400
colleen.smith@lw.com

Michele D. Johnson
Kristin N. Murphy
650 Town Center Drive, 20th Fl.
Costa Mesa, California 92626
Telephone: (714) 540-1235
michele.johnson@lw.com
kristin.murphy@lw.com

Blair G. Connelly
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
blair.connelly@lw.com

*Attorneys for Plaintiff Endeavor Group Holdings, Inc.*